**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ **SEP 2 8 2018** ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

CARLOS WARD

                     Petitioner,

       – against –

THOMAS GRIFFIN, Superintendent,
Green Haven Correctional Facility

               Respondent.

-------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

15-cv-2579 (AMD)

**ANN M. DONNELLY**, United States District Judge.

      The petitioner, Carlos Ward, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was convicted in New York Supreme Court, Kings County of Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree, and was sentenced as a second violent felony offender to an indeterminate prison sentence of from twenty years to life, to run consecutive to the petitioner's twenty-year sentence for a Nassau County home invasion robbery. The petitioner argues that both his trial and appellate counsel were ineffective. He says that his trial lawyer should have objected to the prosecutor's comments in summation, to allegedly hearsay testimony, and to the trial court's jury instructions on the issue of identification. The petitioner also complains that his lawyer unwittingly opened the door to evidence that the petitioner pled guilty to a Nassau County robbery. Finally, the petitioner attacks his appellate counsel's failure to challenge the seating of an alternate juror. For the reasons that follow, the petition is denied.

## FACTUAL BACKGROUND

1. Overview

      The petitioner's conviction arose out of the murder of Hector Negron, a drug dealer from

1

whom the petitioner regularly bought drugs. At about 9:00 p.m. on November 16, 2005, the petitioner, angry because Negron had told people that the petitioner used drugs, went with his friend, Corey Ellis, to Negron's apartment on Fulton Street in Brooklyn. Negron opened the door, and after a heated exchange, the petitioner shot Negron six times. Negron died at the scene.[1]

Mildred Rivera, Negron's girlfriend, was in a parked car near the apartment building when Negron was murdered. She saw the petitioner—whom she recognized as one of Negron's customers—enter and exit the apartment building at the time of Negron's murder. Investigating detectives interviewed Rivera, and generated a "wanted card" for the petitioner, a "person of interest."

On December 11, 2005, approximately a month after the homicide, Nassau County police officers arrested the petitioner, Ellis, and another person in connection with a home invasion burglary. Detectives learned during their interview of Ellis that the petitioner was involved in Negron's murder. The Nassau County detectives advised the Brooklyn detectives that the petitioner was in custody; the Brooklyn detectives subsequently went to the Nassau County precinct to interview the petitioner. The Nassau County detectives questioned the petitioner during three separate interviews over the course of fourteen hours. The petitioner eventually confessed to the robbery and gave written statements to the Nassau County detectives and a videotaped statement to a Nassau County assistant district attorney. The petitioner also confessed to shooting Negron; he made oral and written statements to the Brooklyn detectives, and gave a videotaped statement to a Nassau County assistant district attorney.

Prior to the trial in this case, the petitioner pled guilty to the Nassau County crimes, and was sentenced to a determine sentence of 20 years. On June 18, 2008, the petitioner went to trial

---

[1] The petitioner also shot Negron's dog; the dog was euthanized.

in this case before the Honorable Gustin Reichbach and a jury. His defense was that the Nassau County detectives forced him to confess to the Nassau County robbery, and that he felt compelled to confess to killing Negron. The petitioner also claimed that he was with a friend when Negron was murdered.

## 2. Jury Selection

During jury selection, the petitioner's attorney exercised peremptory challenges to five Asian jurors on the panel. During the first round of jury selection, counsel exercised challenges to two Asian jurors. (V. 178.)[2] During the second round, counsel exercised challenges to three Asian jurors, including juror Wei Lu. (*Id.*) Judge Reichbach asked that petitioner's lawyer give a race-neutral reason for his challenges to the Asian jurors in the second round. (V. at 178-83, 335.) The petitioner's lawyer defended his challenges to two of the Asian jurors on the basis that they were victims of crimes, which Judge Reichbach accepted. (*Id.*) Counsel's reason for challenging Ms. Liu was that he "didn't get a good feeling from her," and she seemed like "someone who would just go along with what the group would say." (*Id.* at 182.) The court rejected the explanation as "pretextual" and seated Ms. Liu as the second alternate juror, over counsel's objection. (*Id.* at 182-83, 236.) Ms. Liu, never served as a regular juror and was dismissed before deliberations began. (T. 935.)

## 3. Relevant Evidentiary Rulings[3]

The petitioner's criminal record included convictions for attempted second-degree robbery,

---

[2] Parenthetical references preceded by "V." are to the transcript of the *voir dire*. Parenthetical references preceded by "T." are to the transcript of the trial. Parenthetical references preceded by "S." are to the transcript of the sentencing.

[3] On May 28, 2008, the court held a *Wade/Huntley* hearing on the petitioner's motion to suppress his confessions and Rivera's photographic identification of the petitioner. Nassau County Detectives Jeffrey Gross and Robert Hillman testified, as did Brooklyn Detective Stephen Hunter. The court denied both motions, finding that the petitioner's waiver of his rights was knowing and voluntary, and that the identification procedures were reasonable and not unduly suggestive. (PT. at 14-19.) Parenthetical references preceded by "PT." are to the transcript of the pretrial suppression hearing.

first-degree robbery and burglary, and criminal possession of a weapon in the second degree. (PT. at 8.) Prior to trial, Judge Reichbach ruled, pursuant to *People v. Sandoval*, 34 N.Y.2d 371 (1974), that if the petitioner testified, the prosecutor would be permitted to ask whether the petitioner had four felony convictions, and the dates of those convictions. (PT. 7-11.) The court precluded any questions about the nature of the convictions or their underlying facts. (*Id.*)

The petitioner's defense was that detectives coerced his confession; Judge Reichbach ruled that if the petitioner claimed that the confession was involuntary because he was in custody for an extended period of time, the prosecutor would be permitted to show that the Nassau County police were also investigating another incident during which they obtained information that "led [them] to call the Brooklyn cops." (T. at 3-7.)

After defense counsel's opening statement, Judge Reichbach warned him that any suggestion that the petitioner's confession to the Nassau County crime was involuntary would "open the door" to evidence that the petitioner pled guilty to the charges in that case. (*Id.* at 59-61.)

4. Trial

    a. *The Prosecution's Case*[4]

In November of 2005, Mildred Rivera lived with her boyfriend, Hector Negron, and their dog, Princess, in a fourth-floor apartment at 2192 Fulton Avenue in Brooklyn. (T. 193-98.) Negron sold cocaine and marijuana from their apartment, and regularly sold drugs to the petitioner. (*Id.* at 198-202.) Rivera saw the petitioner "almost every day," and accompanied Negron when he

---

[4] The prosecution called 12 witnesses: Mildred Rivera; Brooklyn Police Officer Adam Samet; Detective Thomas O'Brien from NYPD's Crime Scene Unit; Nassau County Assistant District Attorney Fred Klein; medical examiner Floriana Persechino; gunshot residue expert Eric Rieth; ballistics expert Detective James Valenti; veterinarian technician Robert Hendrix; Nassau County Detectives Jeffrey Gross and Robert Hillman; Nassau County Police Officer Peter LaRocco; and Brooklyn Detective Robert Schulman.

dropped off drugs at the petitioner's apartment at 212 Hull Street in Brooklyn. (*Id.* at 199-202.) Corey Ellis also bought drugs from Negron, and frequently came to their apartment with the petitioner. (*Id.* at 201.)

Sometime before November 16, 2005, the petitioner repeatedly telephoned Negron and asked for cocaine. (*Id.* at 202-04.) He then arrived at their apartment early one morning, and asked for drugs. (*Id.*) Negron refused to sell him any more drugs until he paid for all the drugs Negron had given him. (*Id.*)[5] The petitioner was angry and left, but eventually paid Negron for the drugs. (*Id.*)

On November 16, 2005, Rivera and Negron drove to Knickerbocker Avenue in Brooklyn to pick up an "eight ball" of cocaine from a "Dominican" man. (*Id.* at 204-05, 229-30, 232-35.) After retrieving the cocaine, Negron drove back to their apartment, and parked the car near the building. (*Id.* at 205-06.) A man got in the backseat behind Rivera, bought drugs from Negron, and left. (*Id.* at 235-38.) Rivera did not see the man's face, and did not know from where the man had come or where he went after he left the car. (*Id.* at 235-38, 250-52.)

Rivera and Negron had planned to go to CVS after Negron dropped off the drugs, so Rivera stayed in the parked car and played games on Negron's cellphone while Negron went into the building. (*Id.* at 205-06, 210-1.) At one point, a young black man with a bicycle went into the building. (*Id.* at 210-12.) Approximately fifteen minutes after Negron went inside, Corey Ellis and the petitioner walked towards the building, and waited by the door; when the man with the bicycle left, Ellis and the petitioner went inside. (*Id.*)[6]

---

[5] On cross-examination, the petitioner's lawyer confronted Rivera with her marijuana use, and established that she did not remember if she smoked marijuana the day Negron was murdered. (*Id.* at 232-34.) The petitioner's lawyer also established that Negron had argued with their neighbor, a light-skinned black man named "Clash" who frequently bought drugs from Negron, and that Clash may have burglarized their apartment and stolen money, jewelry and drugs from them. (*Id.* at 237-42, 265-67.)

[6] Rivera identified the petitioner in court as the man she saw walking into their building the night of Negron's murder. (*Id.* at 213.)

Approximately four minutes later, the petitioner and Ellis left the building and walked towards Hull Street, where the petitioner lived. (T. 210-15.) Rivera did not see a weapon. (*Id.* at 215.) The police eventually arrived, and Rivera learned from them that Negron had been killed. (*Id.* at 215-16.)

At approximately 9:00 p.m., 73rd Precinct Police Officer Adam Samet and his partner, were in a marked patrol car when they received a radio call reporting that shots had been fired at Negron's building. (*Id.* at 64-65.) They arrived at Negron's apartment, and heard a dog barking inside. (*Id.* at 66-67.) They knocked but no one answered, so Officer Samet opened the door, and saw Negron lying face down at the end of the hallway; there were two bullet wounds on the side of the Negron's head, and a large pool of blood directly underneath his head. (*Id.* at 66-68.) The dog, who stood directly over the body, had blood on her chest and was moaning. (*Id.* at 69.)[7]

Officer Samet radioed for an ambulance, additional officers, and other police personnel. (*Id.* at 70.) Detectives from the Crime Scene Unit arrived and recovered seven shell casings from the scene, one spent round from Negron's pants, and three spent rounds from underneath the floorboards. (*Id.* at 74-77, 136.) Officer Samet found $279 in cash, drugs, and drug paraphernalia in Negron's bedroom. (*Id.* at 101-06.) He vouchered those items as well as the ballistic evidence, and sent it to the ballistic laboratory, which showed that all of the bullets and casings were fired from the same gun. (*Id.* at 78, 311-16.)[8]

73rd Precinct Detectives Robert Schulman and Stephen Hunter arrived at the scene, spoke to Rivera who was still in the car, and took her back to the precinct. (*Id.* at 536-37.) The detectives also drove Rivera around the neighborhood, and she showed them where the petitioner lived. (*Id.* at 217, 537.)

---

[7] The dog was taken to the New York City Animal Care and Control and later euthanized. (*Id.* at 72, 332-340.)

[8] There were no guns in the apartment. (*Id.* at 78-79, 125.)

Counsel established on cross-examination that Rivera did not tell the detectives that she went with Negron to buy drugs earlier that night, that she was playing games on a phone when she saw the petitioner, that she had seen a man with a bicycle go into the building, or that another detective took her to look for "Clash." (*Id.* at 559-567.) Accordingly, on redirect examination, the prosecutor elicited evidence that Rivera told Detectives Schulman and Hunter that she saw the petitioner and Corey Ellis go into and leave the building, and that she knew who they were and where they lived. (*Id.* at 567-68.)[9] The prosecutor also established that the detectives prepared a "wanted card" for the petitioner but could not find him. (*Id.* at 540.)

On December 11, 2005, at approximately 8:25 p.m., Detective Jeffrey Gross was working at the Nassau County Police Department when Police Officer Peter LaRocco arrested the petitioner and two other individuals in connection with an unrelated matter. (*Id.* at 343-345, 354.) The officer brought the petitioner to the precinct, where he was searched, and taken to an interview room; the petitioner sat on the bench in the room and one of his arms was handcuffed to the bench. (*Id.* at 345-46, 512.)

At approximately 8:35 p.m., Detective Gross showed the petitioner a form card containing pre-printed *Miranda* warnings, and asked him to read the first line aloud. (*Id.* at 348-49.) After Detective Gross determined that the petitioner could read and write, he advised him of his rights, reading from the form. (*Id.*) The petitioner was "likable," "polite," and "very intelligent;" he acknowledged that he understood the warnings, and agreed to speak to the detective. (*Id.* at 347-49, 353, 363-64, 393, 514-15.) The petitioner signed and dated the form card, as did Detective Gross and Officer LaRocco. (*Id.* at 349, 394, 513.) Detective Gross subsequently interviewed the

---

[9] Detective Schulman did not testify about Rivera's statements on direct examination. (*Id.* at 540.)

petitioner regarding the Nassau County incident and the petitioner spoke to him. (*Id.* at 349.)[10] Detective Gross then left the petitioner to interview another suspect in the Nassau County matter. (*Id.* at 351-55.)[11]

At approximately 12:30 a.m., Detective Robert Hillman interviewed the petitioner about the Nassau County matter. (*Id.* at 477-84.) Because Detective Gross had already advised the petitioner of his rights, Detective Hillman did not read the petitioner his rights again. (*Id.* at 477, 485-86.) The petitioner was responsive and "spoke with [him] freely;" he did not appear impaired or agitated in any way. (*Id.* at 476-78.) At approximately 1:15 a.m., Detective Gross joined Detective Hillman in the interview room. (*Id.* at 396, 478.) Because the petitioner's account was inconsistent with what the other suspects had told him, Detective Gross was "frustrated." (*Id.* at 369-71, 400-05.) He sat close to the petitioner, and yelled at him, but did not touch him or slam anything down. (*Id.*) The petitioner "start[ed] to close off," so Detective Gross changed his tone, and became more patient. (*Id.* at 371.) Once he changed his demeanor, the petitioner became more responsive and resumed talking to the detectives. (*Id.*) Around 2:10 a.m., the detectives stopped the interrogation and left the room. (*Id.* at 479-80.)[12]

Detective Hillman and Detective Gross spoke to the petitioner again, at about 6:30 a.m. (*Id.* at 368, 371, 405-06, 480.) The petitioner did not seem alarmed or agitated, and did not appear to be injured. (*Id.*) Detective Gross showed the petitioner the other suspect's written statements,

---

[10] At various points in the trial, Judge Reichbach gave the jury limiting instructions that testimony about the Nassau County case was admitted "for [the] limited purpose of giving the background of the defendant's custody at the time he made a statement which the People contend is related to this case." (T. 158; *see also* T. 351.) Judge Reichbach instructed the jury that the fact the petitioner was in custody in connection with another matter was "no proof whatsoever that he possessed a propensity or disposition to commit a crime," or that he killed Negron. (T. 159, 351.)

[11] LaRocco, who was responsible for transporting and guarding the petitioner in the precinct, left the room when Detective Gross began questioning the petitioner. (T. 526.) LaRocco did not ask the petitioner any questions about the Nassau County or the Brooklyn case. (*Id.* at 516.)

[12] The detectives interviewed the other two suspects in the robbery case, and arranged for videotaped confessions at the Nassau County District Attorney's Office, which took several hours. (T. 356-61.)

and the petitioner admitted that he was involved in the Nassau County matter. (*Id.* at 364, 371, 405-406.) The petitioner also gave a written statement, which Detective Gross transcribed on a pre-printed form card that also included *Miranda* warnings. (*Id.* at 480-82, 497.) Detective Gross read both the warnings and the petitioner's statements to the petitioner, who signed the form and initialed each *Miranda* warning.[13] (*Id.* at 364-68, 480-81, 497.) The petitioner also agreed to give a videotaped statement about the Nassau County matter. (*Id.* at 482.)

The petitioner remained calm and responsive throughout the questioning, and there was nothing unusual about the petitioner's demeanor. The petitioner went to the bathroom twice, drank a cup of water, and slept on and off during the night. (*Id.* at 515-16, 519.) None of the officers hit the petitioner or used any force against him. (*Id.* at 405, 491-93, 516.)

Neither Detective Hillman nor Detective Gross knew about the Brooklyn murder when they first interviewed the petitioner. (*Id.* at 350, 480.) It was not until later in the Nassau County investigation that Detective Gross learned that the petitioner was a "person of interest" in the Negron murder. (*Id.* at 361-62.) He called the 73rd Precinct and advised Detective Stephen Hunter that the petitioner was in custody. (*Id.*) Detectives Robert Schulman and Hunter arrived at around 1:45 a.m. on December 12, 2005, and waited until the Nassau County detectives finished their interviews. (*Id.* at 361-62, 541-42.) The Brooklyn detectives had no contact with the petitioner, and were not in the interview room while Detectives Gross and Hillman interviewed the petitioner. (*Id.* at 371-72.)

After Detective Gross finished taking the petitioner's written statement in the Nassau County matter, he told the petitioner that two Brooklyn detectives had questions for him. (*Id.* at

---

[13] The form was admitted into evidence, but the statement was redacted so that only the *Miranda* warnings and the petitioner's signature were visible. (T. 369-77.) The court told the jury that the form was relevant only to the issue of voluntariness. (*Id.*)

9

372-73.) The petitioner agreed to speak to the detectives, and sometime between 7:00 a.m. and 7:40 a.m., Detective Gross introduced the petitioner to Detectives Hunter and Schulman. (*Id.* at 372-73, 409, 543.) Detective Gross left and went to the Nassau County District Attorney's Office. (*Id.* at 379, 410.)

Detective Schulman removed the petitioner's handcuff, and left the room to get the petitioner cigarettes, candy bars, and a soda. (*Id.* at 543-44.) The petitioner was alert, awake, and friendly. (*Id.* at 379, 410.) When Detective Schulman came back, he read the petitioner his rights using a preprinted form. (*Id.* at 545.) The petitioner wrote down his responses to each of the *Miranda* questions, initialed each response, and signed the card, as did Detectives Schulman and Hunter. (*Id.* at 545-51.) Detective Schulman told the petitioner that they were investigating Negron's homicide and asked if he knew anything about Negron. (*Id.* at 548.) The petitioner "didn't hesitate;" he told the detectives that he was unhappy because Negron told people that the petitioner used cocaine. (*Id.* at 547-53.) He ran into his friend, Corey Ellis, and asked him to go to Negron's apartment. (*Id.*) The petitioner had a gun; he confronted Negron and they got into an argument. (*Id.*) He shot Negron because he thought Negron was reaching for a gun. (*Id.*) The petitioner ran out of the building, and saw Negron's girlfriend sitting in a car. (*Id.*) The petitioner went home, and gave the gun to "Ivan" who "got rid of it." (*Id.*) The petitioner wrote out his statement, and signed and dated it. (*Id.* at 550-553.) The detectives also signed the statement. (*Id.* at 553.)[14] Detective Schulman asked if the petitioner was willing to give a videotaped statement, and petitioner agreed. (*Id.* at 553.)

At approximately 10:00 a.m., the detectives took the petitioner to the Nassau County District Attorney's Office. (*Id.* at 160-61, 380, 554.) Assistant District Attorney Fred Klein

---

[14] The petitioner's written statement was introduced into evidence. (T. 551.)

advised the petitioner of his rights and questioned him about an unrelated matter. (*Id.* at 162, 190, 380, 483.) The petitioner was "calm, composed," and "alert," and "comfortable speaking to" Klein. (*Id.* at 161-62, 381-82.)

Approximately thirty minutes after the first video, ADA Klein conducted a separate videotaped interview of the petitioner in connection with this case. (*Id.* at 165-67.) He advised the petitioner of his rights again, and the petitioner acknowledged that he understood them. (*Id.* at 165, 184-86, 555.) The petitioner was still "cooperative," "calm," "pleasant," and aware. (T. 165-66, 555.)

    b. *The Petitioner's Case*

Judge Reichbach reminded defense counsel that if the petitioner challenged the voluntariness of his statements about the Nassau County case, the prosecutor would be permitted to establish that that the petitioner pled guilty to the charges in that case, without going into the facts or charges. (T. 583-85.) Both parties understood the court's ruling. (*Id.*; *see also id.* at 60-61.)

The petitioner testified that he grew up in an abusive home, and ran away at the age of thirteen to live with his father, who was also abusive. (*Id.* at 588-90.) The petitioner ran away from his father and lived in a residential treatment facility for the next three years. (*Id.*) In November of 2005, he lived with his fiancée, Jamie Vasquez, and their three children at 212 Hull Street. (*Id.* at 587.)[15]

On November 16, 2005, from 1:00 pm to 6:00 pm., the petitioner was taking classes at the Institute of Audio Research in Manhattan. (*Id.* at 603-04, 648.) Around 6:00 p.m., Robert Merkman picked the petitioner up from school, drove him back to Merkman's house where they

---

[15] The petitioner admitted that he was convicted of a felony in 2001 and three felonies in 2006. (*Id.* at 643, 665.)

watched television, and had sex. (*Id.* at 604-05.)[16] At approximately 9:15 p.m., Vasquez called Merkman's house looking for the petitioner, and Merkman drove the petitioner home. (*Id.* at 605-06.) The petitioner arrived home at approximately 9:50 p.m., changed his clothes, and bought beer at a store, where he spoke to someone named Brandon. (*Id.* at 605-07.) The petitioner then went home. (*Id.* at 607.)

Although the petitioner bought cocaine and marijuana from Negron, he did not "hang[] out" with Negron, and had no disagreements or problems with him. (*Id.* at 598-99, 603.) Another drug dealer in the neighborhood named "Rico," whose build was similar to the petitioner's, hung out with Negron in the neighborhood. (*Id.* at 599, 601.)

The petitioner was arrested in Nassau County on December 11, 2005, placed in a cell area, and handcuffed to a bench. (*Id.* at 608-12.) He was "nervous" and "scared." (*Id.*) He had used ecstasy and marijuana earlier that day, and was "extremely high, paranoid, hot, [and] sweating." (*Id.* at 608-10.)

The Nassau County detectives interrogated the petitioner, but did not read him his rights. They screamed at him and called him names, and ignored his request for an attorney. (*Id.* at 613-25.) At one point, Detective Gross "smacked" him "across the face," and repeatedly kneed him in the stomach and groin area, while he was sitting on the bench. (*Id.*) The detectives told the petitioner that he could not leave until he gave them a statement. (*Id.*) Detective Gross threatened that the petitioner was going to be "pissing blood for the next six months" if he did not tell the detectives what they wanted to hear. (*Id.* at 625-31.) He also showed the petitioner an article about a man who had been killed in the county jail. (*Id.*) The petitioner confessed to the Nassau County matter because he was scared and in pain, and wanted the detectives to stop hitting him.

---

[16] The petitioner and Merkman met in 2003; although the petitioner's fiancée knew that the two were friends, she did not know that they were involved in a sexual relationship. (*Id.* at 594-96, 605.)

(*Id.* at 626-28, 632.) The petitioner had pain in his abdomen, groin, and ribs, but he never told anyone that he was hurt and never sought medical attention. (*Id.* at 626, 651-52.)

Ten minutes after he was coerced into making a statement about the Nassau County case, Detectives Schulman and Hunter came into the room and said that they were investigating a shooting in Brooklyn. (*Id.* at 628-33.) When the petitioner said that he did not know anything about a shooting, Detective Hunter rolled up his sleeve, and said, "We c[an] do this the easy way or the hard way." (*Id.* at 633.) Detective Schulman, who had left the room to get the petitioner a cigarette and soda, returned, and told the petitioner that he was "gonna give us something," that Negron was a "piece of shit," and that if the petitioner claimed self-defense, he would not "have anything to worry about." (*Id.* at 634-35.) At some point, Detective Hunter told the petitioner that Rivera saw him coming out of the building, that the petitioner should "just save [him]self," that they wanted to close their case, and that the petitioner would not be charged if he confessed. (*Id.* at 637-38.)

Even though he did not kill Negron, the petitioner confessed to the murder in writing and on videotape. (*Id.* at 639.) The detectives supplied him with the details of the murder, including the day and time Negron was shot. (*Id.*) The petitioner confessed only because he was scared, in pain, and wanted to leave the precinct; he thought the detectives would eventually discover that he had an alibi, even though he did not tell anyone—ADA Klein or the detectives—that he was with Merkman the night of the murder. (*Id.* at 637-42, 650-56.)

During cross-examination, the prosecutor established that the petitioner laughed at various points in the Nassau County interview, and said that the police treated him fairly; the petitioner also admitted that he pointed at the officers who treated him particularly well. (*Id.* 645-46.) The prosecutor also confirmed that the petitioner was claiming that the detectives coerced his statement

in the Nassau County case. (*Id.* at 665-67.) The prosecutor subsequently established that the petitioner pled guilty to the Nassau County charges. (*Id.* at 666.) The petitioner stated that he did not raise his coercion claim in the Nassau County case because he "was having [adversarial] things with [his] lawyer." (*Id.* at 667.)[17]

The prosecutor also established on cross-examination that the petitioner wrote two letters—to his cousin and to Vasquez—while he was incarcerated. He told his cousin to write a letter to Ellis, and say that the petitioner could win his case only if Ellis "take[s] the stand and say that Rico . . . is the one that hit [Negron]." (*Id.* at 683.) The petitioner told his cousin to send the letter to Ellis without leaving any fingerprints or DNA evidence so that the letter could not be traced back to the petitioner. (*Id.* at 679-80.) The petitioner also wrote to his fiancée; he asked her to visit Ellis and tell him to say that he went with Rico to buy marijuana from Negron, that Rico shot Negron as soon as Negron opened the door, that Rico was very dangerous and had shot and killed other people in the neighborhood, that he was scared of Rico, and he was coming forward because Rico was in jail. (*Id.* at 687-92.) The petitioner also instructed Vasquez to tell Ellis that he was the only one who could save the petitioner, and that the petitioner's "people" would "take care of him." (*Id.* at 690.) The petitioner wrote those letters in order to get Ellis to "tell the truth." (*Id.* at 692.)

Robert Merkman testified that on November 16, 2005, he picked the petitioner up from school. (*Id.* at 743-45.) They went to his apartment and had sex, and Merkman drove the petitioner home around 9:30 p.m. (*Id.* at 743-48.) Merkman was reluctant to expose his homosexuality and

---

[17] The petitioner's lawyer moved for a mistrial, and denied opening the door to the plea. (*Id.* at 697-98.) Judge Reichbach denied the motion because the petitioner opened the door when he testified at length that his Nassau County statements were coerced. (*Id.* at 697-99.) Thus, a guilty plea was "completely relevant to his credibility" and his claims of coercion. (*Id.*)

did not want to break up the petitioner's relationship with Vasquez and his children so he did not come forward until more than two years after the murder. (*Id.* at 760-65.) However, Vasquez knew that he and the petitioner were friends, and that they often spent time together. (*Id.* at 762-63, 795.) Merkman visited the petitioner twice in 2007, but the petitioner never asked him to tell the police that he was with the petitioner the night of Negron's murder. (*Id.* at 766.)

Jamie Vasquez testified that the petitioner called her the night Negron was killed, and told her he was going to Merkman's apartment after school. (*Id.* at 776.) At approximately 9:00 p.m., Vasquez went to the store with a friend, Peter LaRosa, to get some food. (*Id.* at 786-87.) Rico— a man who was very similar to the petitioner—and Ellis were walking away from Negron's building, towards Hull Street. (*Id.* at 773-802.) LaRosa stopped to speak to Rico and Ellis, while Vasquez walked to the store. (*Id.* at 786.) When LaRosa caught up with her, he looked "shaken up and edgy." (*Id.* at 790-91.) Vasquez later learned that Negron was shot. (*Id.* at 793.) At around 10:00 p.m., Vasquez was sitting outside in front of the building alone, smoking a cigarette, when the petitioner got out of Merkman's car. (*Id.* at 782.) Vasquez and the petitioner spoke briefly. (*Id.*) The petitioner went upstairs and Merkman drove away. (*Id.*)

When the police questioned her in March of 2006, Vasquez did not tell them that the petitioner was with Merkman. (*Id.* at 804-05.) When she and Merkman visited the petitioner in jail, neither Merkman nor the petitioner ever mentioned that they were together the night Negron was killed. (*Id.*)

c. *The Rebuttal*

On rebuttal, the prosecutor re-called Detective Gross and confirmed that the detective never hit the petitioner or used any force against him. (T. 806.) The prosecutor also played a portion of the petitioner's Nassau County video showing the petitioner's responses about his treatment by

the police. (*Id.* at 808-10.)[18] Detective Gross testified that when the petitioner said that the police treated him well, the petitioner pointed at him, and then at Detective Hillman, and identified them as being particularly nice. (*Id.* at 646, 810-11.)

  d. *The Summations*[19]

  Both parties focused on the voluntariness of the petitioner's confessions, and the strength of Rivera's eyewitness identification. The petitioner's lawyer argued that the Nassau County and Brooklyn detectives' conduct rendered the petitioner's confession involuntary. (*Id.* at 824-25.) The petitioner's lawyer also argued that Rivera was not credible, and that her identification of the petitioner was unreliable; she was distracted because she was playing games on her phone when she allegedly saw the petitioner, and there were other credible suspects including Rico and "Clash," who could have killed Negron. (*Id.* at 831-42.)

  The prosecutor argued that the petitioner's written and videotaped confessions and his post-arrest letters to his cousin and fiancée constituted overwhelming evidence of guilt. (*Id.* at 846-47, 855-66.) The prosecutor also challenged the petitioner's credibility as well as the credibility of his witnesses; he argued that the petitioner and his witnesses "lie[d]" to the jury; that the petitioner was a "puppet master" and had engaged in "extraordinary levels of manipulation;" that the petitioner was "trying to elicit sympathy from" the jury and "play" the jury; and that it was "disrespectful that the [petitioner] would ask [them] to leave some common sense at the door." (*Id.* at 850-66.) The prosecutor also told the jury that the case "was about a search for the truth" and a "search for justice." (*Id.* at 848.)

  The petitioner's lawyer did not object to the prosecutor's comments in summation.

---

[18] The court again told the jury that the portions of the video were introduced solely on the issue of voluntariness of the petitioner's Brooklyn statements. (T. 808-10.)

[19] Before the parties gave their closing arguments, the court advised the jury that nothing the lawyers said in summation was evidence. (*Id.* at 819.)

e. *Jury Charge*

Judge Reichbach charged the jury limiting instructions about the limited relevance of the Nassau County matter, and that it was not proof of a propensity or disposition to commit the crime charged in this case. (*Id.* at 893-94.) He reminded the jury that the petitioner's statement in the Nassau County case was relevant only to the question of voluntariness. (*Id.* at 894.)

The court charged the jury on the relevance of Mildred Rivera's prior identification:

> It is [] relevant to establish that soon after the commission of the crime, while the witness' memory was perhaps fresher than at present, Mildred Rivera identified this defendant to the police as the person she saw outside of her home at the time of the crime and pointed out the defendant's home to the police . . . Such prior identification of the defendant, Carlos Ward, as the perpetrator may be considered by you together with all the other relevant evidence from whatever source on the issue of identification in evaluating the accuracy of the witness' identification here in court of the defendant as the perpetrator of the crime charged.

(*Id.* at 895-99.) The judge told the jury that it had to decide whether Rivera was mistaken "when she identified [the petitioner] as the perpetrator." (*Id.*) Neither party objected to the court's charge. (*Id.* at 925.)[20]

5. Verdict

Wei Liu, the second alternate juror, was dismissed before deliberations began. (T. 935.) The jury deliberated for approximately two days and reached a verdict on June 30, 2018. The jury found the petitioner guilty of Murder in the Second Degree, and Criminal Possession of a Weapon in the Second Degree. (*Id.* at 966.)

6. Sentencing

On July 29, 2008, Judge Reichbach sentenced the petitioner, as a second violent felony offender, to concurrent sentences of twenty years to life on the murder charge and a determinate sentence of five years for the weapon count; the sentences were to run consecutive to the twenty-

---

[20] This language appears to be part of the standard instructions used by New York judges in criminal cases.

year sentence that the defendant was serving on the Nassau County case. (S. 27.)[21]

## PROCEDURAL HISTORY

1. Direct Appeal

The petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department. (ECF No. 7-4, at 2-65.) The petitioner argued that he was denied due process and a fair trial when Detective Schulman testified about Rivera's identification of the petitioner outside of their building, and by the testimony about the petitioner's guilty plea in the Nassau County case. (*Id.*) The petitioner also faulted the trial court's statement in the identification charge that Rivera identified the petitioner as the "perpetrator" while her memory was "fresher." (*Id.*) The petitioner claimed that the prosecutor's summation was improper, and the petitioner's trial counsel was ineffective because he did not object to any of these alleged errors.[22] (*Id.*)

On May 8, 2013, the Second Department affirmed the petitioner's conviction. *People v. Ward*, 106 A.D.3d 842 (2d Dep't 2013). The appellate court determined that the petitioner's guilty plea in the Nassau County matter "was properly admitted" because the petitioner "opened the door to such evidence by testifying that his statement in that matter was the result of coercion." *Id.* at 842-43. Moreover, the disclosure of the petitioner's guilty plea was not "unduly prejudicial": the parties did not discuss "the nature of the charge, the underlying facts, or the content of his statement." *Id.* The jury was also aware of the petitioner's felony conviction, and the trial court issued "appropriate limiting instructions in relation to testimony involving the Nassau County matter, which the jury is presumed to have followed." *Id.*

---

[21] Judge Reichbach also imposed five years of post-release supervision for the criminal possession weapon charge. (S. 29.)

[22] The petitioner also filed a *pro se* supplemental brief arguing that Judge Reichbach impermissibly intervened at trial by questioning the witnesses, and that he was biased in favor of the prosecution; the petitioner did not raise these arguments in this petition. (ECF No. 7-4, at 137-51.)

The court rejected the petitioner's challenge to the prosecutor's summation, finding that it was "unpreserved for appellate review," and in any event, that "although some of the prosecutor's statements were improper, they were not so flagrant or pervasive as to deprive the defendant of a fair trial." *Id.* As for the ineffective assistance claim, the appellate court found that the petitioner's "right to effective assistance of counsel was satisfied by the meaningful representation afforded by trial counsel." *Id.* at 843. The state appellate court also held that the petitioner's remaining claims were unpreserved for appellate review, and that they were, in any event, without merit. *Id.*

On October 18, 2013, the Court of Appeals denied the petitioner's application for leave to appeal. *People v. Ward*, 22 N.Y.3d 959 (2013).

## 2. Writ of Error *Coram Nobis*

On June 2, 2014, the petitioner filed a petition for a writ of error *coram nobis* seeking to vacate his conviction on the ground that his appellate counsel was ineffective. The petitioner's sole argument was that his appellate counsel failed to appeal the trial court's decision to seat prospective juror Wei Liu as the second alternate juror. (ECF No. 7-4 at 173-95.) On October 29, 2014, the Second Department summarily denied the petition because the petitioner did not establish that he was denied the effective assistance of appellate counsel. *See People v. Ward*, 121 A.D.3d 1131 (2d Dep't 2014).

## DISCUSSION

### 1. Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires that a federal court reviewing a state prisoner's habeas petition give deference to a state court's decision on the merits. 28 U.S.C. § 2254(d). The federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly

established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*; *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13.

A state prisoner must therefore show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[23]

2. Analysis

The petitioner raises the same ineffective assistance of counsel arguments that formed the basis of his direct appeal and writ of error *coram nobis*. He argues that his trial counsel was ineffective because he did not object to Detective Schulman's testimony about Rivera's

---

[23] Moreover, a petitioner can seek federal habeas corpus relief only after he exhausts state court remedies, giving the state courts a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

identification of the petitioner, the trial court's identification charge, and the prosecutor's comments on summation. The petitioner also argues that his lawyer opened the door to his guilty plea in the Nassau County matter. Finally, the petitioner claims that his appellate counsel was ineffective because he did not appeal the seating of Wei Liu as an alternate juror.

Since the state courts rejected the petitioner's ineffective assistance of counsel claim on the merits, AEDPA deference applies. Thus, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Rosas v. Artus*, No. 05-CV-8440 (RJS), 2013 WL 499610, at *4 (S.D.N.Y. Jan. 29, 2013) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The petitioner cannot satisfy the test established in *Strickland v. Washington*, 466 U.S. 668 (1984) in the first instance, much less show that the state court applied *Strickland* "in an objectively unreasonable manner." *Contant v. Sabol*, 987 F. Supp. 2d 323, 329-30 (S.D.N.Y. 2013) ("Where, as here, a petitioner seeks habeas review of an ineffective-assistance-of-counsel claim under the test announced in *Strickland*, review is 'doubly deferential.'") (citations omitted).

A defendant claiming ineffective assistance of counsel must show (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. Under the first prong, the petitioner must overcome the "strong presumption" that counsel's performance fell within "the wide range of reasonable professional assistance" by showing that counsel failed to act "reasonabl[y] considering all the circumstances." *Strickland*, 466 U.S. at 688-89; *see also Contant*, 987 F. Supp. 2d at 329-30. In applying this standard, "substantial deference must be accorded to counsel's

judgment." *Premo v. Moore*, 562 U.S. 115, 126 (2011). "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citations omitted); *see also United States v. Helgesen*, 669 F.2d 69, 72 (2d Cir. 1982) ("Trial advocacy is an art, and the advocate must be given some latitude in deciding upon an appropriate trial strategy.").

Under the prejudice prong, the petitioner must prove that the "attorney's errors resulted in prejudice to the defendant." *Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Thus, "the question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63–64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695) (internal bracket removed). "[E]ven objectively unreasonable errors on the part of counsel will not result in setting aside a judgment in a criminal proceeding if the errors can be shown to have had no effect on the judgment." *Diaz v. Marshall*, No. 04-CV-1650 (KAM), 2011 WL 2802836, at *9 (E.D.N.Y. July 14, 2011) (quoting *Strickland*, 466 U.S. at 691).

As the Supreme Court explained, "[s]urmounting *Strickland's* high bar is never an easy task" and "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The "central concern is not with grading counsel's performance but with discerning whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *United States v.*

*Aguirre,* 912 F.2d 555, 561 (2d Cir. 1990) (quoting *Strickland,* 466 U.S. at 696-97) (internal quotations and brackets omitted).

This same *Strickland* standard also applies to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right." *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir. 2001); *see also Reynart v. Griffin,* No. 11-CV-0748 (PKC), 2017 WL 6626247, at *11 (E.D.N.Y. Oct. 9, 2017) ("[C]laim of ineffective assistance of appellate counsel is also evaluated under *Strickland*'s two-prong standard.").

### a. *Claims of Ineffective Assistance by Trial Counsel*

#### i. *Detective Schulman's Testimony*

At trial, Detective Schulman testified on redirect examination that Rivera identified the petitioner as one of the men she saw entering and leaving Negron's apartment building around the time Negron was killed. (T. 567-68.) The petitioner claims that his lawyer should have objected to this testimony as hearsay, and that his failure to do so allowed Detective Schulman to bolster Rivera's testimony in violation of *People v. Trowbridge,* 305 N.Y. 471 (1953). (*See* ECF No. 1, at 5; *see also* ECF No. 7-4, at 39-42.)

The detective's testimony was admissible on redirect examination as a response to counsel's cross-examination. Defense counsel cross-examined the detective on Rivera's failure to include certain details in her interview: that she used drugs earlier that day, that there were other people in the neighborhood who had problems with Negron, that a man with a bicycle went into and left the apartment building, and that other detectives took her to look for "Clash" after Negron's murder. (*See* T. 559-67.) The prosecutor was entitled to respond by eliciting the rest of Rivera's statement to the detectives—that she saw the petitioner enter and leave the building around the time Negron was killed. *See People v. Gonzales,* 145 A.D.3d 1432, 1433 (4th Dep't

2016) ("[O]nce defense counsel elicited selected portions of the prior statement of the witness on cross-examination, the prosecutor was free to elicit the balance of the statement in order to give the evidence before the jury its full and accurate context."). *See also People v. Ochoa*, 14 N.Y.3d 180, 187 (2010) (redirect examination of complainant's prior statement did not constitute impermissible bolstering because the prosecutor was "seeking merely to fill in the gaps that defense counsel left during cross-examination, after defense counsel implied that [the witness's] entire statement to [the] police was a lie."); *DeLucia v. West*, No. 04-CV-3605 (DC), 2005 WL 1981708, at *6 (S.D.N.Y. Aug. 17, 2005) (Under New York law, previously inadmissible evidence may become admissible where a party "'opens the door' on cross-examination to matters not touched upon during the direct examination," and "[i]n such situations, an opposing party has the right on redirect examination 'to explain, clarify and fully elicit [the] question only partially examined on cross-examination' to present the full picture to the fact finder.") (quoting *People v. Melendez*, 55 N.Y.2d 445, 451 (1982)). The detective's testimony was admissible, and defense counsel's failure to object was not ineffective.[24]

Moreover, the petitioner has not demonstrated that he was prejudiced by his counsel's failure to object. Rivera identified the petitioner at trial and was cross-examined at length about her identification.[25] *See, e.g., Sanders v. Superintendent, Green Haven Corr. Facility*, No. 10-CV-1025 (ENV), 2014 WL 3519127, at *6 (E.D.N.Y. July 15, 2014) (Under New York law, bolstering of another eyewitness identification by a police officer alone "rarely constitutes reversible error,

---

[24] To the extent that the petitioner argues that his lawyer should not have opened the door in the first place, that claim also fails. "Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *Strickland*, 466 U.S. at 689). As the only witness who placed the petitioner near the crime scene, Rivera was the key prosecution witness. Counsel's decision to cast doubt on Rivera's credibility by cross-examining the detective about omissions from her statement was not unreasonable.

[25] The admission of so-called "bolstering" testimony would not violate any provision of the United States Constitution. *See, e.g., Heath v. Lavalley*, No. 11-CV-02962 (ERK), 2014 WL 4954658, at *2 (E.D.N.Y. Oct. 2, 2014) (collecting cases).

except where there is a danger that the jury will take the police officer's testimony as a substitute for identification by the eyewitness or if undue prominence is given to the bolstering testimony.") (citing *People v. Middleton*, 159 A.D.2d 350, 351 (1st Dep't 1990)); *Martin v. Garvin*, No. 92-CV-3970 (LBS), 1993 WL 138813, at *3-4 (S.D.N.Y. Apr. 23, 1993) (counsel's failure to object did not constitute ineffective assistance of counsel; the admission of the bolstering testimony was harmless error because the complainants who identified the petitioner at trial were subject to cross-examination and there was no danger that the jury would substitute the police officers' testimony for that of the complainants).

In any event, the evidence of the petitioner's guilt was overwhelming. The evidence established that the petitioner was at the scene around the time Negron was murdered, that the petitioner confessed in writing and on videotape, and that the petitioner attempted through his letters, to pin the murder on "Rico." The petitioner's defense—that the detectives beat the confession out of him—was undermined by his failure to report any injuries and the evidence that he laughed on the videotape and told the ADA that the police treated him fairly. Similarly, his alibi defense was undermined by the alibi witnesses' failure to come forward until the trial. Given the strength of evidence against the petitioner, there is no reasonable probability that the petitioner would have been acquitted because of his lawyer's decisions.

### ii. *Jury Charge*

Similarly unpersuasive is the plaintiff's argument that his lawyer was ineffective because he failed to object to the language in the court's use of the word "perpetrator" in the identification charge. (*See* ECF No. 1, at 5; ECF No. 10, at 8-9.) To succeed on an ineffective assistance of counsel claim based on trial counsel's failure to object to jury instructions, the petitioner must show not only that the trial counsel's failure to object "fell below an objective standard of

reasonableness," but that he was prejudiced as a result of this deficient performance. *Strickland*, 466 U.S. at 687-89; *see also Hobson v. Wendlend*, No. 11-CV-3225 (MKB), 2017 WL 4675764, at *8 (E.D.N.Y. Oct. 13, 2017) (citing *Brown v. Greene*, 577 F.3d 107, 110 (2d Cir. 2009)).

"[A] state prisoner making a claim of improper jury instructions faces a substantial burden" in establishing prejudice that rises to the level of a federal constitutional deprivation. *Del Valle v. Armstrong*, 306 F.3d 1197, 1200-01 (2d Cir. 2002); *accord Hobson*, 2017 WL 4675764, at *8; *Murray v. People of New York*, No. CV-15-3555 (JFB), 2017 WL 3704677, at *8 (Aug. 28, 2017). The petitioner must establish that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violat[ed] due process,' not merely [that] 'the instruction is undesirable, erroneous, or even universally condemned.'" *Del Valle*, 306 F.3d at 1201 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). Moreover, any allegedly erroneous jury instruction should be reviewed in light of the "well-established proposition that a single instruction to a single jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)); *see also Huber v. Schriver*, 140 F. Supp. 2d 265, 282 (E.D.N.Y. 2001); *People v. Medina*, 18 N.Y.3d 98, 104 (2011). "A trial counsel's failure to object to legally correct jury instructions does not constitute ineffective assistance." *Hobson*, 2017 WL 4675764, at *8; *see also United States v. D'Agostino*, 638 F. App'x 51, 53-55 (2d Cir. 2016) (summary order).

The statements about which the petitioner complains did not violate the petitioner's rights to due process and a fair jury trial, particularly when the charge included the correct legal standards, including that the jury had to weigh the witnesses' credibility and prove identification beyond a reasonable doubt. *See, e.g.*, *People v. Whalen*, 59 N.Y.2d 273, 279 (1983) ("A Judge who gives a general instruction on weighing witnesses' credibility and who states that

identification must be proven beyond a reasonable doubt has made an accurate statement of the law" and "[n]o cognizable prejudice accrues to any party."); *accord Aparicio*, 269 F.3d at 100; *Huber v. Schriver*, 140 F. Supp. 2d at 283-84.

On this record, the court's use of the word "perpetrator" could not have confused the jury. The court told the jury that Rivera had identified the petitioner as "the person she saw outside of her home at the time of the crime," and reminded them that they were the "sole and exclusive judges of the facts" and that they were to "resolv[e] each and every issue of fact . . . solely on the evidence in the case and that evidence alone." (T. 875-76, 898.) The jury, who presumably followed the instructions, knew that Rivera testified only that she saw the petitioner entering and leaving Negron's apartment building, and that she did not see the shooting. Under the circumstances, defense counsel's failure to object was not objectively unreasonable.

### iii. *Guilty Plea in the Nassau County Matter*

The petitioner also faults his trial counsel for opening the door to evidence that the petitioner pled guilty to the Nassau County matter.[26] There is no basis to disturb the state court's rejection of this claim. "The performance inquiry [of *Strickland*] examines the reasonableness of trial counsel's actions under 'all the circumstances,' from the perspective of trial counsel at the time." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (internal citations omitted). A significant part of the petitioner's defense was that the detectives coerced him to confess in the Nassau County case, rendering his confession in this case involuntary. This strategy was "well within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699. The strategy, which was based on the petitioner's claims about the interrogation, was not unreasonable,

---

[26] The petitioner's claim that his lawyer failed to object to the plea after he opened the door to such evidence is meritless. (ECF No. 1, at 5.) The record shows that his lawyer did object, and in fact, moved for a mistrial after the petitioner's testimony. (T. 665-66, 697-98.)

nor was counsel's decision to risk the introduction of the guilty plea through his line of inquiry.

Even if the defense counsel's strategy had been unreasonable, the petitioner has not established prejudice under *Strickland*. As the state appellate court noted, there were no references to the nature of the charges, the underlying facts, or the contents of the petitioner's statements in the Nassau County case. *Ward*, 106 A.D.3d at 842-43. The jury also knew that the petitioner had four prior felony convictions. (*Id.*) The court gave several limiting instructions about the inferences they could draw about the Nassau County matter, and that the guilty plea was not evidence of the petitioner's propensity to commit the crime charged in this case. (*Id.*) Given these precautions, there is no probability that had the guilty plea in the Nassau County matter been omitted, the petitioner's conviction would have been different.

### iv. *The Prosecutor's Summation*

The petitioner also argues that his lawyer should have objected to the prosecutor's comments in summation that the petitioner and defense witnesses lied, and that the petitioner was a "master manipulator" and "puppet master." The Second Department found that although "some of the prosecutor's statements were improper, they were not so flagrant or pervasive as to deprive the defendant of a fair trial." *Id.* at 843.

Even if some of the prosecutor's comments were objectionable, the petitioner cannot show that the "result of the proceeding would have been different" had his attorney objected. *Strickland*, 466 U.S. at 694; *see, e.g.*, *Paige v. Lee*, 99 F. Supp. 3d 340, 347 (E.D.N.Y. 2015); *King v. Greiner*, 453 F. App'x 88, 90 (2d Cir. 2011) (summary order). As discussed above, the evidence of the petitioner's guilt was strong, and there was no reasonable probability that the petitioner would have been acquitted if his attorney had registered objections. In any event, the trial court mitigated any potential prejudice from the prosecutor's remarks when he told the jury that the "summations

of counsel are [] not evidence in the case" and that it was free to reject any arguments made in summation. (T. 819, 874-75.) *See, e.g., Martin,* 1993 WL 138813, at *5-6 (no prejudice where the court told the jury that they could disregard counsel's arguments). Thus, the petitioner's claim for habeas relief is denied.

### b. *Claims of Ineffective Assistance by Appellate Counsel*

The petitioner's remaining claim—that his appellate counsel was ineffective for failing to appeal the trial court's decision to seat Wei Liu as an alternate juror—is also meritless. The failure by appellate counsel to raise meritless claims on appeal does not constitute ineffective assistance. *See United States v. Noble,* 363 F. App'x 771, 773 (2d Cir. 2010) (summary order) ("An attorney's '[f]ailure to make a meritless argument does not amount to ineffective assistance.'") (quoting *United States v. Arena,* 180 F.3d 380, 396 (2d Cir. 1999)); *accord Diaz,* 2011 WL 2802836, at *8-10. Ms. Liu, an alternate juror, was dismissed prior to deliberations; thus, the trial court's decision to seat Ms. Liu did not affect the composition of the petitioner's jury or the jury deliberations in any way. *See, e.g., People v. Stephens,* 255 A.D.2d 532, 533 (2d Dep't 1998). There was therefore no basis for appellate counsel to challenge the trial court's decision.

### CONCLUSION

The petitioner has not shown that the performance of either his trial or appellate lawyer fell below an objective standard of reasonableness or that there is a reasonable probability that the alleged errors affected the outcome of his trial. The petition for writ of habeas corpus is denied in its entirety. The case is dismissed. A certificate of appealability will not be issued. *See* 28 U.S.C. § 2253(c).

**SO ORDERED.**

s/Ann M. Donnelly

Ann M. Donnelly
United States District Judge

Brooklyn, New York
Dated: September 28, 2018